# EXHIBIT

# C



Ferrari & Associates, P.C.

1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Tel. 202-280-6370
Fax. 877-448-4885

May 5, 2015

**SENT VIA FACSIMILE, EMAIL, AND FEDERAL EXPRESS: #8064 5021 5574**

Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, D.C. 20220

Re:    **Request for Administrative Record -- Designation of Anwar Saied Joumaa**
       *Kingpin Act Designation Reconsideration—31 C.F.R. § 501.807*

Dear Sir/Madam,

Anwar Saied Joumaa, through undersigned counsel, respectfully requests a copy of the administrative record underlying his designation by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"). Anwar Saied Joumaa ("Petitioner") was designated on January 27, 2011, pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. § 1901 *et seq.*[1]

Petitioner submitted a formal request for reconsideration of his designation under the Kingpin Act to OFAC on March 17, 2015. Petitioner contends that he does not act for or on behalf of Ayman Joumaa or his organization (the "Joumaa organization"), or, at a minimum, that there has been a change of circumstances to negate the factual basis for his designation; and, as such, acting pursuant to 31 C.F.R. § 501.807, Petitioner requested reconsideration of his designation. In furtherance of the reconsideration process, Petitioner now requests that OFAC disclose any and all portions of the administrative record relied upon in the designation process , as well as any releasable exhibits attached to the administrative record.

This request seeks, *inter alia*, copies of SDN designation packets prepared by, or in the possession of, OFAC or OFAC's Office of Global Targeting ("OGT"), and copies of any documents, information, reports, memoranda, or summaries supporting the decision to designate Petitioner. It is undersigned counsel's belief that OFAC/OGT is in the best position to disclose

---

[1] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Department of the Treasury, Feb. 1, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

1

this information.   Further, OFAC/OGT's disclosure of the requested administrative records would lead to a more expeditious and efficacious process.

## I.   Legal Basis for Request

In light of judicial precedent on the issue, Petitioner respectfully requests that OFAC/OGT promptly provide Petitioner with the unclassified portions of the administrative record that served (and/or continus to serve) as a basis for his Kingpin Act designation. Furthermore, Petitioner, through undersigned counsel, requests disclosure of classified information that served (and/or continues to serve) as the basis for his designation to the extent that such a request does not implicate OFAC's reasonable national security concerns.   For reasons discussed below, due process mandates the disclosure of such information.

First, Petitioner requests the unclassified portions of the administrative record that served (and/or continues to serve) as the basis for his Kingpin Act designation.   Judicial precedent supports Petitioner's request, requiring OFAC to promptly provide to a requesting designated party the unclassified administrative record on which it relied in undertaking a blocking action.[2] In *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, the court held that in order to comply with its due process requirements, OFAC should – at the very least – promptly provide the party challenging its blocking action with the unclassified administrative record on which it relied in taking its blocking action.[3]   Without such a record, "OFAC's invitation to send a letter challenging the block held out no hope that any challenge would be either comprehensive or successful."[4]   Furthermore, in *KindHearts*, OFAC's provision of an uninformative unclassified record to the petitioner was considered inadequate post-deprivation process.[5]

As such, Petitioner contends that he should, at a minimum, promptly be provided the unclassified portions of the administrative record underlying his designation.   Failure to do so would be in contravention of established due process rights for persons on the SDN List whose property and/or interests in property subject to U.S. jurisdiction have been blocked.   In addition, such unclassified portions must be reasonably informative.   Therefore, Petitioner respectfully requests disclosure of the unclassified portion of the administrative record that served (and/or continue to serve) as a basis for his designation.

Second, Petitioner also respectfully requests disclosure of any and all classified information that served (and/or continues to serve) as a basis for his designation to the fullest

---

[2] *Zevallos v. Obama*, 10 F.Supp.3d 111(citing *Holy Land Foundation for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F.Supp.2d 857, 905 (N.D. Ohio 2009)).

[3] *KindHearts for Charitable Humanitarian Dev., Inc.*, 647 F.Supp.2d at 905.

[4] *Id.*

[5] *Id.*

extent possible.  In *Al Haramain Islamic Foundation, Inc. v. U.S. Dept. of Treasury*, a case in which an entity on the SDN List challenged its OFAC designation, the Ninth Circuit reasoned that, although the disclosure of classified information may not always be possible, several avenues exist to disclose such information without implicating OFAC's legitimate national security concerns or causing an undue burden to the agency.[6]  The court elaborated on such methods in *Al Haramain*, indicating that, "[t]o the extent that an unclassified summary could provide helpful information, such as the subject matter of the agency's concerns, and to the extent that it is feasible to permit a lawyer with a security clearance to view the classified information, the value of those methods seems undeniable."[7]  The court suggested that, without disclosure of classified information, a designated entity could not possibly know how to respond to OFAC's concerns.[8]  It further reasoned that, "[w]ithout knowledge of a charge, even simple factual errors may go uncorrected despite potentially easy, ready, and persuasive explanations."[9]

By providing access to classified information to the designated party, the court in *Al Haramain* noted, "...the benefits from such disclosure could flow not only to the designated entity, which may be able to clear up errors, but also to OFAC, which may benefit from the resulting information provided by the entity."[10]  In other words, the disclosure of certain classified information would prove mutually beneficial for the agency and the designated party alike.  To deal with any persistent fear over disclosure of classified information, the court stated that the review of the classified information could be undertaken by counsel with appropriate security clearance, which would "not implicate national security when viewing the classified material because, by definition, he or she [would have] the appropriate security clearance."[11]  In light of the mutual benefits of providing designated parties with access to certain classified information and the means to ensure that such classified information remains as such (i.e., providing undersigned counsel an interim SECRET level clearance), Petitioner requests disclosure of any such classified information to the fullest extent possible.

Furthermore, undersigned counsel requests access to any and all classified information pertaining to Petitioner's designation because of his legitimate "need-to-know."[12]  This "need-to-know" arises from the performance of "a lawful and authorized governmental function," namely the exercise of OFAC's administrative due process obligations in the reconsideration context.[13]  Executive Order 13526 anticipates that the "need-to-know" may exist "outside the executive

---

[6] 686 F.3d 965, 982-84 (9th Cir. 2011).

[7] *Id*. at 982-83.

[8] *Id*. at 982.

[9] *Id*.

[10] *Id*. at 983.

[11] *Id*.

[12] *See* Executive Order 13256, § 4.1(a)(3).

[13] *See* Executive Order 13256, § 6.1(dd).

3

branch."[14]  In such circumstances, the agency must ensure that the protection of information in a manner equivalent to that provided within the Executive branch.[15]  Undersigned counsel contends that a reasonable interpretation of this Executive order enables his review of the classified information in OFAC's possession that is relied upon in maintaining Petitioner's designation.

Consistent with the requirements of the Executive order, undersigned counsel has already executed the required non-disclosure agreements and has received the appropriate training on the proper safeguarding of classified information when he applied for, and was issued, an interim SECRET level clearance in a separate case involving classified information.[16]  Moreover, undersigned counsel would not disclose to his clients any classified information to which he may be granted access.  Accordingly, undersigned counsel requests authorization to review such information, subject to any reasonable supervisory conditions that the agency deems prudent and necessary.

In light of undersigned counsel's SECRET level security clearance and the legitimate need-to-know the information relied upon for Petitioner's designation in order to have a meaningful opportunity to respond to such information, OFAC is respectfully requested to allow undersigned counsel an opportunity to review those portions of the administrative record underlying Petitioner's designation that are classified at the SECRET level or below.  As noted above, the review of classified information by undersigned counsel "does not implicate national security when viewing the classified material because, by definition, [undersigned counsel] has the appropriate security clearance."[17]

In addition, or in the alternative, undersigned counsel respectfully requests an unclassified summary of the classified portions of the administrative record underlying Petitioner's designation.  If OFAC were to elect this method of providing Petitioner with an unclassified summary of the administrative record serving as a basis of his designation, its national security concerns would be alleviated because "...an unclassified summary, by definition, does not implicate national security because it is unclassified."[18]

Undersigned counsel respectfully contends that the disclosure of such information to the fullest extent possible will facilitate the reconsideration process, as it will allow Petitioner to determine what specific circumstances OFAC is relying upon to maintain his designation and afford him an opportunity to respond to or remediate such circumstances, thereby establishing a

---

[14] *See* Executive Order 13526, § 4.1(e).

[15] *Id.*

[16] *See* §§ 4.1(a)(3) & 4.1(b) of Executive Order 13526 (Dec. 29, 2009).

[17] *Al Haramain Islamic Foundation, Inc.*, 686 F.3d at 983.

[18] *Id.*

change in behavior for which removal can take place.  In short, this request is not simply to rebut the factual bases underlying Petitioner's designation, but also to assist Petitioner in changing the behavior(s) that served (and/or continue to serve) as the basis for the designation.

Petitioner, acting through undersigned counsel, thus respectfully requests that OFAC/OGT disclose any and all unclassified portions of the administrative record as soon as possible.  Furthermore, to the extent possible, disclosure of the classified portions of the administrative record, by the means described above, is also requested.  If there is any question concerning this request, please contact undersigned counsel at the contact information below:

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Phone: 202-280-6370
Facsimile: 877-448-4885
Email: ferrari@ferrariassociatespc.com

We thank you for your consideration and look forward to your response.

Sincerely,

Erich C. Ferrari



**Ferrari & Associates, P.C.**

1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Tel. 202-280-6370
Fax. 877-448-4885

August 3, 2015

**SENT VIA EMAIL, FACSIMILE, AND FEDERAL EXPRESS: # 8079 8332 7116**

Mark Samara
Assistant Director
Crime/Narcotics & Western Hemisphere Division
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
Treasury Annex
1500 Pennsylvania Ave., NW
Washington, DC 20220

Re:     **SDN Reconsideration Petition Supplement-Section 805 of the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1903(b)**
*Anwar Saied Joumaa-FNK-5088*

Dear Mr. Samara,

On January 26, 2011, acting pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Anwar Saied Joumaa ("Respondent") for his alleged "involvement in the drug trafficking or money laundering activities of the Joumaa organization."[1]  On March 17, 2015, Respondent, acting by and through undersigned counsel, filed a formal request for reconsideration of his designation under the Kingpin Act.  That reconsideration case has been assigned a Case ID of FNK-5088.

On May 5, 2015, OFAC sent undersigned counsel a questionnaire seeking information and/or documents responsive to a series of questions relevant to OFAC's consideration of Respondent's reconsideration request.  Below are responses to those inquiries, as well as analysis and additional considerations addressing why Respondent's designation should be rescinded.

---

[1] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dept. of Treasury's Office of Foreign Assets Control, Jan. 26, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

[2] In the past, Respondent has used the email address master_101@live.com.  He no longer uses this email address.

Because this response contains business information and other information of a sensitive nature, undersigned counsel requests that OFAC treat this correspondence confidentially. If OFAC believes that it is required to release this document or any of the information contained in it to the public pursuant to the Freedom of Information Act ("FOIA") or any other law, please notify undersigned counsel as soon as possible. Undersigned counsel will promptly provide additional information in support of this request for confidentiality.

## I.  Responses to OFAC's May 5, 2015 Questionnaire

1.  **Personal Identifying Data.** Please provide or confirm the following, if applicable.

    a.  Alternate name(s) or alias(es)

        **Response:** Respondent is also known by the following names:

        - Anwar Said Jomaa
        - Junior

    b.  Date and place of birth

        **Response:** ███████████████████████

    c.  Mailing address(es)

        **Response:** █████████████████

    d.  Phone number(s)

        **Response:** █████████

    e.  Email address:

        **Response:** ████████████████ [2]

    f.  Passport number(s), place/date of issue, and expiration

        **Response:** Respondent has the following passport information:

---

[2] In the past, Respondent has used the email address █████████ He no longer uses this email address.

(i)    Lebanon Passport No. ███████ issued on February 23, 2008, expired March 29, 2013;[3]

(ii)    Colombia Passport No. ██████ issued in Beirut, Lebanon on February 2, 1961, expired on April 26, 2011;[4]

(iii)    Colombia Passport No. ███████, issued in Beirut, Lebanon on July 6, 2011, expires November 24, 2015;[5]

(iv)    Colombia Passport No. ██████, issued in Beirut, Lebanon on July 19, 2013, expires on July 19, 2023;[6] and

(v)    Venezuela Passport No. ███████, issued in Caracas, Venezuela on February 8, 2013, expires on February 7, 2018.[7]

g.    U.S. visa number(s), type, place/date of issue, and expiration

**Response:** Respondent obtained a U.S. visa in 1995 and 1996, valid for five years from the date of issuance, in Bogota, Colombia. This visa was used to travel once to Miami, Florida in the U.S. Respondent does not have a copy of this visa.

h.    U.S. resident alien number(s) or asylum document number(s)

**Response:** There is no information responsive to this request.

2.    What relationship, including but not limited to financial or business relationships, does your client have or have had with the following individuals? If your client has ended your relationship with any of the individuals listed below, please explain.

a.    Ayman Saied JOUMAA

---

[3] Exhibit A-Joumaa Passport No. ██████
[4] Exhibit B-Joumaa Passport No. █████
[5] Exhibit C-Joumaa Passport No. ███████.
[6] Exhibit D-Joumaa Passport No. ██████.
[7] Exhibit E-Joumaa Passport No. █████.

**Response:** Ayman Saied Joumaa is Respondent's brother.  In 1987, Ayman Saied Joumaa moved to Colombia to start working at Almacen Junior – a clothing shop operated by Respondent and Akram Saied Joumaa.  Soon thereafter, the three brothers opened a new shop – Almacen Junior No. 2.  This latter shop was placed under the direct management of Ayman Saied Joumaa, while Akram Saied Joumaa retained ultimate supervision over both clothing stores.

In 1990, Ayman Saied Joumaa replaced Akram Hassan Shaitely as one of the joint owners of Junior International Co.  Local law required a newly-started company to have three founders prior to formation.  As a result, Junior International Co. was jointly-owned by Ayman Saied Joumaa, Akram Saied Joumaa, and Anwar Saied Joumaa.

In 1993, after Akram Saied Joumaa sold Junior International Co. to Samir el-Joulani, the three brothers founded Junior Hermanos.  Respondent was involved in the new company's incorporation as one of its joint owners, along with Ayman Saied Joumaa.

In 2000, Akram Saied Joumaa opened a joint banking account for the three brothers – Respondent, Akram, and Ayman – at Barclays Bank in Miami, FL.  This bank also had a branch in Colon Panama Zona Libre.  Respondent did not know anything about the account and had no relationship to it.  His name was put on the account merely to aid in opening it.

Soon thereafter, in 2001, Respondent ended his business relationship with his brothers, including Ayman Saied Joumaa.  There was an acrimonious break in the partnership, but the brothers did manage to agree to enter into a settlement agreement that divided the profits of their joint business enterprises.

Since this break in the business relationship, Respondent has had no further business or financial relationship with Ayman Saied Joumaa.  On the contrary, Respondent's only relationship with his brother is familial, as they see each other during family occasions.

b.      Mohamad Saied JOUMAA

**Response:** Mohamad Saied Joumaa is Respondent's youngest brother.   In 1992, Mohamad Saied Joumaa entered into the family's trading business when he started to work at Almacen Junior No. 2.

In 2000, Respondent helped his brother, Mohamad Saied Joumaa, incorporate Junior 2000 KPC in Venezuela.  The reason for this is that, at the time, Mohamad Saied Joumaa did not yet have the appropriate papers from the Venezuelan authorities permitting him to start a new company, whereas Respondent had received the proper papers.   As a result, Respondent was instrumental in forming the new company.   However, it should be stressed that Respondent played no further role in the operations of the company.  Instead, his sole role was to aid in incorporation of the company.

Soon thereafter, in 2001, Respondent ended his business relationship with his brothers, including Mohamad Saied Joumaa. There was an acrimonious break in the partnership, but the brothers did manage to agree to enter into a settlement agreement that divided the profits of their joint business enterprises.

Since this break in the business relationship, Respondent has had no further business or financial relationship with Mohamad Saied Joumaa.  On the contrary, Respondent's only relationship with his brother is familial, as they see each other during special family occasions.

c.      Akram Saied JOUMAA

**Response:** Akram Saied Joumaa is Respondent's eldest brother. Respondent started working with Akram Saied Joumaa when he traveled to Maicao, Colombia in 1977.  At the time, Lebanon was in the midst of a civil war.  Like many other Lebanese, Respondent moved to Latin America, where his eldest brother had established a clothing shop.

Upon his arrival in Maicao, Colombia, Respondent began to work in Akram Saied Joumaa's clothing shop – Almacen Junior. Respondent was a sales manager at the clothing shop, but did not have a fixed wage or salary.  Instead, working in partnership with his brother, he earned a percentage of the shop's profits, taking $2,000-$3,000 from the store per month to fund living needs.

Following the success of Almacen Junior, the two brothers—along with Akram Hassan Shaitely—founded Junior International in 1986.  The store was placed under the management of Akram Saied Joumaa, though Respondent was one of the three joint owners.

Soon thereafter, in 1987, Respondent became a joint owner with Akram Saied Joumaa and Ayman Saied Joumaa in Almacen Junior No. 2.  However, Respondent did not play a significant role in operating the new shop, as management was held by Ayman Saied Joumaa and supervisory powers were exercised by Akram Saied Joumaa.

In 1993, Akram Saied Joumaa sold Junior International Co. to Samir el-Joulani and, acting together with Respondent and Ayman Saied Joumaa, opened a new business – Junior Hermanos.

In 1995, Respondent conferred upon Akram Saied Joumaa an irrevocable power of attorney for the purpose of opening banking accounts in Lebanon.[8]

In 2000, Akram Saied Joumaa opened a bank account at Barclays Bank in Miami, FL on behalf of himself, Respondent, and Ayman Saied Joumaa.  The bank also had a branch in Colon Panama Zone Libre.  Respondent's name was on the account in order to aid in opening it.  However, Respondent had no relationship to the account whatsoever.

The business relationship between Respondent and Akram Saied Joumaa fell apart, however, when Respondent left Colombia to move back to Lebanon and Akram Saied Joumaa transferred all

---

[8] Exhibit F-Power of Attorney Document.

funds from joint accounts held in Lebanon to his own personal accounts without consent. This led to an acrimonious break-up of the brothers' business and financial partnership. Eventually, the accounts were settled through an agreement, and the share of profits accumulated from the businesses over the years were divided between the brothers.

Moreover, at the same time as the break-up of the brothers' businesses, Respondent executed a "Waiver, Acquittal, and Deposal of a General Power of Attorney," which had been previously granted to Akram Saied Joumaa.[9] In this document, Respondent terminated the power of attorney and also "discharge[d] and release[d] [his brothers, Akram and Ayman] from any claim concerning said partnership and from any previous commercial or civil dealing."[10]

Currently, Respondent has no business or financial relationship with Akram Saied Joumaa and has not had such a relationship since 2001. The sole point of contact between the brothers is during family occasions, where they will be friendly with each other.

d.     Ismael Mohammed YOUSSEF

       **Response:** Ismael Mohammed Youssef is Respondent's cousin. Respondent has no financial or business relationship with Mr. Youssef.

e.     Ziad Mohamad YOUSSEF

       **Response:** Ziad Mohamad Youssef is Respondent's cousin. Respondent has no financial or business relationship with Mr. Youssef.

---

[9] Exhibit G-Waiver, Acquittal, & Deposal of a General Power of Attorney Document.
[10] Exhibit G-Waiver, Acquittal, & Deposal of a General Power of Attorney Document.

    f.      Jamal Mohamad KHAROUBI

        **Response:** Respondent does not know who Jamal Mahmoud Kharoubi is and has had no financial or business relationship with him.

    g.      Ali Mohamed KHARROUBI

        **Response:** Respondent does not know who Ali Mohamed Kharroubi is and has had no financial or business relationship with him.

3.    <u>Relationships with SDNT Entities and other Companies</u>.  Please describe the current nature and title of each position held, any financial interest, or any other relationship your client has had with the following entities in any of their locations?  If any of the relationships with any of the individuals/entities listed below has ended, please explain:

    a.      ELLISSA HOLDING

        **Response:** Respondent is not familiar with Ellissa Holding Company and is not linked to it in any manner whatsoever.

    b.      ELLISSA EXCHANGE COMPANY

        **Response:** Respondent is not familiar with Ellissa Exchange Company and is not linked to it in any manner whatsoever.

    c.      PHENICIA SHIPPING OFFSHORE SARL

        **Response:** Respondent is not familiar with Phenicia Shipping Offshore SARL and is not linked to it in any manner whatsoever.

    d.      SOLMAR

        **Response:** Respondent is not familiar with Solmar Company and is not linked to it in any manner whatsoever.

e.    ELLISSA GROUP SA

**Response:** Respondent is not familiar with Ellissa Group SA and is not linked to it in any manner whatsoever.

f.    ELLISSA SHIPPING

**Response:** Respondent is not familiar with Ellissa Shipping and is not linked to it in any manner whatsoever.

g.    YAMEN BENIN SARL

**Response:** Respondent is not familiar with Yamen Benin SARL and is not linked to it in any manner whatsoever.

h.    ELLISSA MEGASTORE

**Response:** Respondent is not familiar with Ellissa Megastore and is not linked to it in any manner whatsoever.

i.    NEW LINE EXCHANGE TRUST CO.

**Response:** To Respondent's knowledge, New Line Exchange Trust Co. is owned by Ziad and Ismael Youssef.  However, Respondent does not know where the company is located and has not dealt with the company.

j.    CAESAR'S PARK HOTEL

**Response:** Caesar's Park Hotel is owned by Respondent's brother, Akram Joumaa.  Respondent visited the hotel once at the time of its opening in 2003 or 2004, but is not otherwise linked with the hotel in any manner whatsoever.

k.    GOLDI ELECTRONICS S.A.

**Response:** Goldi Electronics S.A. is owned by Respondent's brother, Ayman Joumaa.  Respondent is not otherwise linked to the company in any manner whatsoever.

l.     ZONA LIBRE INTERNATIONAL MARKET S.A.

**Response:** Respondent is not familiar with the Zona Libre International Market S.A. and is not linked to it any manner whatsoever.

m.     ALMACEN JUNIOR

**Response:** Respondent started to work at Almacen Junior upon his arrival in Maicao, Colombia in 1977.  The clothing-shop was owned and operated by Respondent's brother, Akram Saied Joumaa, at the time, and Respondent joined the shop as a sales manager, splitting the business's profits with his brother.  The shop was located at Street No. 13, Carrera Tracy, Store 11-24.

Almacen Junior imported ready-to-wear clothes from Panama, which were then sold to local customers.  During the early years, the clothing shop was prosperous and the two brothers earned significant profits.

Since the break-up of the business relationship between Respondent and his brothers in 2001, however, Respondent has had no relationship to Almacen Junior.  Respondent moved to Lebanon in 2000, where he now lives and works, and has maintained no contact with the clothing shop.

n.     ALMACEN JUNIOR NO. 2

**Response:** Almacen Junior No. 2 was founded in 1987 as a sister shop to Almacen Junior, following the arrival of Ayman Saied Joumaa to Colombia a year earlier.  The shop was opened to allow Ayman Saied Joumaa to operate his own shop, while Respondent maintained a managerial role at Almacen Junior.  Akram Saied Joumaa exercised supervisory powers over both companies, however.

Because local law required three individuals to be named on the documents of incorporation, Respondent is considered one of the shop's founders.  However, Respondent played a limited role in the company and has not maintained any relationship to the shop since

2001, when the brothers ended their business relationship and entered into a settlement.

Almacen Junior No. 2 was located at Street No. 10, Store #1246 in Maicao, Colombia.

o.     COMERCIAL PLANETA

     **Response:** Comercial Planeta is a company owned by Respondent's cousin, Ismael Youssef.   Respondent is not otherwise familiar with the company and is not linked to it in any manner whatsoever.

p.     HASSAN AYASH EXCHANGE COMPANY

     **Response:** Respondent is not familiar with the Hassan Ayash Exchange Company and is not linked to it in any manner whatsoever.

Please detail any relationship with any other companies or individuals on the list of Specially Designated Nationals and Blocked Persons (SDN List). A copy of the current SDN List can be found on Treasury's website at                    http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx. If your client has been employed by or involved in any other business relationships with additional SDNs, please provide the length of time and specific dates of employment and describe each position, his duties in each position, the salaries and other benefits (such as stock shares) received in each position, and the date and conditions of separation or retirement from each company. If your client held a written employment contract, please provide a copy. If your client had some other type of relationship with these SDN companies or individuals, please provide an explanation of such relationship.   If your client ceased employment and/or renounced financial interest(s), please provide official documentation.

     **Response:** Respondent was a co-founder of Junior International Co., along with his brother, Akram Saied Joumaa, and Jorge Fadlallah Cheaitelly (who Respondent knew as Hassan Shaitely). Respondent's role was that of a nominal co-founder and he played no active role in the company.

Junior International was founded in 1986 and the store was placed under the management of Akram Saied Joumaa. In 1990, Jorge Fadlallah Cheaitelly left the company and was replaced with Ayman Saied Joumaa. In 1993, Junior International Co. was sold to Samir el-Joulani, and Respondent's relationship with the entity thereby ended.

4.     On December 29, 2011, OFAC designated Lebanese-Colombian nationals Jorge Fadlallah CHEAITELLY (CHEAITELLY) and Mohamad Zouheir EL KHANSA (EL KHANSA) as SDNTs pursuant to the Kingpin Act due to their significant role in international money laundering activities involving drug trafficking proceeds. On the same date, OFAC also designated nine other individuals and 28 entities in Colombia, Panama, Lebanon, and Hong Kong with ties to CHEAITELLY and EL KHANSA. What relationships, including but not limited to familial, financial, or business relationships, does your client have or have had with the following individuals? If your client has ended his financial or business relationships with any of the individuals/entities listed below, please explain.

a.     Ivan Dario ARBELAEZ VELEZ

**Response**: Respondent does not know who Ivan Dario Arbalaez Velez is and has no financial or business relationship with him.

b.     Guiseppe Ali CHEAITELLI SAHELI

**Response**: Respondent does not know who Guiseppe Ali Cheaitelli Saheli is and has no financial or business relationship with him.

c.     Jaime EDERY CRIVOSEI

**Response**: Respondent does not know who Jaime Edery Crivosei is and has no financial or business relationship with him.

d.      Ahmad EL KHANSA

**Response:** Respondent does not know who Ahmad El Khansa is and has no financial or business relationship with him.

e.      Mohamad Zouheir EL KHANSA

**Response:** Respondent knows that Mohamad Zouheir El Khansa owned a tailor shop and worked in the clothing sector. Moreover, when El Khansa moved to Colombia, Respondent worked with him twice to tailor clothes. Other than these occasions, Respondent has no ongoing financial or business relationship with him.

f.      Jorge FADLALLAH CHEAITELLY (a.k.a. GIORGIO)

**Response:** In 1986, Akram Saied Joumaa incorporated Junior International in Panama along with Respondent and a person named Jorge Cheaitelley (a.k.a. Hassan Cheaitelly). Provided that this is the same person as Jorge Fadlallah Cheaitelly, Respondent had a business relationship with Jorge Fadlallah Cheaitelly as a co-founder of Junior International until 1990 when Jorge Fadlallah Cheaitelly was replaced by Ayman Saied Joumaa. However, Respondent's business relationship with Jorge Fadlallah Cheaitelly was limited to being the nominal co-founder of Junior International. Respondent did not have an active role in Junior International otherwise.

Moreover, Respondent notes that Junior International's operations never panned out as intended. Akram Saied Joumaa had imported ready-to-wear clothes from a Panamanian company operated by Jorge Fadlallah Cheaitelly. In 1986, the two agreed to enter into a partnership to purchase clothing directly from China rather than through intermediaries. However, despite forming Junior International, the new business performed no substantive commercial work due to conflicts between Akram Saied Joumaa and Jorge Fadlallah Cheaitelly. As a result, the partnership was thus effectively terminated that same year – not to restart until Ayman Saied Joumaa was substituted for Jorge Fadlallah Cheaitelly as co-founder of the business.

Since this time, Respondent has had no business or financial relationship with Jorge Fadlallah Cheaitelly or even contact with him.

g.      Jaime FADLALLAH CHEAYTELLI

**Response:** Respondent does not know who Jaime Fadlallah Cheaytelli is and has no financial or business relationship with him.

h.      Fatima FADLALLATH CHEAITILLY

**Response:** Respondent does not know who Fatima Fadlallath Cheaitilly is and has no financial or business relationship with her.

i.      Benny ISSA FAWAZ

**Response:** Benny Issa Fawaz is a lessee of a residential apartment in Maicao, Colombia, which Respondent owns.  The address of this apartment is ███████████████████████████████████
████████████████████.

Mr. Fawaz has been a lessee of the residential apartment since 2009.  He pays Respondent $300 a month for use of the apartment. Mr. Fawaz sends payment for rent to his mother, who then transfers it to Respondent.

Otherwise, Respondent does not have any financial or business relationship with Mr. Fawaz.

j.      Fawaz Mohamad RAHALL

**Response:** To Respondent's knowledge, Fawaz Mohamad Rahall is also from Lala, West Bekaa, Lebanon, as is Respondent himself. However, Respondent is not otherwise related to Mr. Rahall in any manner whatsoever.

k.      Ali Mohamad SALEH

**Response:** Respondent does not know who Ali Mohamad Saleh is and has no financial or business relationship with him.

5.      On June 27, 2012, OFAC designated Abbas Hussein HARB, Ibrahim CHIBLI, Ali Mohamad SALEH, Ali Houssein HARB, and Kassem Mohamad SALEH as SDNTs pursuant to the Kingpin Act due to their significant role in international money laundering activities involving drug trafficking proceeds.   What relationship, including but not limited to financial or business relationships, does your client have with the following individuals?  If your client has ended his relationships with any of the individuals listed below, please explain.

a.      Abbas Hussein HARB

**Response:** Respondent does not know who Abbas Hussein Harb is and has no financial or business relationship with him.

b.      Ali Houssein HARB

**Response:** Respondent does not know who Ali Houssein Harb is and has no financial or business relationship with him.

c.      Ibrahim CHIBLI

**Response:** Respondent does not know who Ibrahim Chibli is and has no financial or business relationship with him.

d.      Ali Mohamad SALEH

**Response:** Respondent does not know who Ali Mohamad Saleh is and has no financial or business relationship with him.

e.      Kassem Mohamad SALEH

**Response:** Respondent does not know who Kassem Mohamad Saleh is and has no financial or business relationship with him.

6.    U.S. Accounts and Assets.  Please detail any interest you currently hold in any financial accounts or real property in the United States, including names and addresses of financial institutions, types of accounts, and account numbers.

**Response:** Respondent does not currently hold any financial accounts or real property in the United States.  In the 1990s, Respondent held a joint account with his brothers – Anwar Saied and Ayman Saied Joumaa – at Barclays Bank in Miami but that account was closed in 2000.

7.    U.S. Business Interests.   Please detail any interest that your client currently holds or has held in any U.S.-based business entity, to include the nature and title of each position he holds, has held, and his financial interest in said entity(ies).

**Response:** There is no information responsive to this request.

8.    Seized or Frozen Assets.   Have any assets in Mr. Anwar Saied JOUMAA's name been frozen or seized in Benin, Lebanon, the United States or elsewhere?  If so, please describe the assets and the reason(s) for the freezing or seizure(s).  Please also provide the current legal status of these assets.

**Response:** Yes, Respondent's assets in Lebanon have been frozen as a result of his designation under the Kingpin Act.  On March 5, 2011, Lebanese authorities issued Decision No. 3/03/3/2011, which froze all accounts opened by Anwar Saied Joumaa at the Lebanese-Canadian Bank S.A.L. and lifted banking secrecy privileges before judicial authorities as to his accounts there.[11]

On May 31, 2012, the Special Investigation Commission at the Central Bank of Lebanon issued Resolution No. 4/17/12/2012 by which it was decided to "freeze all accounts held, either solely or jointly, directly or indirectly, by the persons whose names are mentioned..."[12]  Respondent's name was included on this list.  As evidenced by the preamble to this resolution, this decision was taken as a result of Respondent's designation

---

[11] Exhibit H-Certificate from Ministry of Justice, Republic of Lebanon.
[12] Exhibit I-Special Investigation Commission Resolution No. 4/17/12/2012.

16

under the Kingpin Act.[13]  To date, Respondent's assets held in Lebanon remain frozen, with a limited exception for living expenses.

9.      Narcotics Trafficking and Money Laundering.  Has your client ever been involved in the cultivation, production, manufacture, distribution, selling, financing, or transport of narcotic drugs (e.g. cocaine, marijuana, heroin, hashish, opium, methaqualone, mandrax), or any other, controlled substance, or listed chemical (as those terms are defined in Section 102 of the Controlled Substances Act, 21 U.S.C. § 802) or endeavored or attempted to do so or assisted, abetted, conspired, or colluded with others to do so?  In addition, have you participated in the laundering of drug proceeds and/or held assets in your name that were obtained with drug proceeds?  If so, with whom?

**Response:** No, Respondent has not been involved in the cultivation, production, manufacture, distribution, selling, financing, or transport of narcotic drugs or any other controlled substances, nor has he ever attempted or conspired with others to do so.  Respondent is also not aware of the laundering of drug proceeds or assets undertaken in his name.

10.     Legal Proceedings.  Has your client ever been, or is he currently the subject of any legal proceedings (including but not limited to civil and criminal investigations, indictments, arrests, warrants for arrests, or convictions) in any jurisdiction worldwide?  If so, please describe these legal proceedings and/or provide any supporting official documentation.

**Response:** Yes, the Special Investigation Commission of the Central Bank of Lebanon issued Resolution No. 4/17/12/2012 on May 31, 2012, and this resolution was forwarded to Public Prosecution Discriminatory at Lebanon's Ministry of Justice.[14]  The Public Prosecution Discriminatory at Lebanon's Ministry of Justice has since engaged in interviews with Respondent regarding the matter, in which Respondent has denied all charges related to narcotics trafficking activities (including money laundering in support of narcotics trafficking).  As of the present date, however, the Public Prosecution Discriminatory at Lebanon's Ministry of Justice has neither rendered a decision on the matter nor instituted criminal or civil charges against Respondent.[15]

---

[13] Exhibit I-Special Investigation Commission Resolution No. 4/17/12/2012.

[14] Exhibit I-Special Investigation Commission Resolution No. 4/17/12/2012.

[15] Exhibit J-Respondent's Certificate Request.

Besides this case, Respondent is not and has not been the subject of either civil or criminal prosecution in any jurisdiction.

11.    <u>Additional Information</u>. Provide any additional information you deem appropriate that could assist OFAC in the review of Mr. Anwar Saied JOUMAA's request for reconsideration.

**Response:** In the interests of full transparency, Respondent, acting by and through undersigned counsel, submits the following points:

i.    <u>Request for the Administrative Record</u>
Respondent has sought the unclassified portions of the administrative record in this matter through a direct request to the Office of Global Targeting ("OGT"). That request was filed on May 5, 2015 and has yet to receive a response. Respondent reiterates that it is absolutely necessary to receive the unclassified portions of the administrative record in order to have a meaningful opportunity to respond to OFAC. Respondent contends that failing to receive the unclassified portions of the administrative record – especially prior to any adverse decision by OFAC on Respondent's pending reconsideration request – would effectively deny him a meaningful opportunity to respond to his designation.

ii.    <u>Supporting Documentation</u>

Second, Respondent produces several documents, attached as exhibits to this response, in support of his denial of any involvement in narcotics trafficking activities (or money laundering in support of such activities). These documents include:

- Cheque drawn to Akram Joumaa, as the price of the Real Estates No. 96 & 98 in Tal Zenoub Real Estate Area, dated December 16, 2002;
- Real estate contract between Respondent and Akram Joumaa, partitioning Real Estates No. 96 & 98 in Tal Zenoub Real Estate Area;

- A comprehensive release and discharge contract between Respondent and his brothers – Akram and Ayman Saied Joumaa – regarding certain commercial activities, which was signed in 2001, as well as a termination of the power of attorney given to Akram Joumaa on behalf of Respondent;
- Banking statements for the savings account that Respondent held at Lebanese-Canadian Bank; and
- Documents relating to Respondent's agricultural work, evidencing his current employment and source of income.

Respondent contends that these documents provide evidence of the nature of his activities over the past 15 years – none of which involve trafficking narcotics or engaging in money-laundering in support of narcotics trafficking activities.

## II.   <u>Legal Analysis</u>

### A.   *Statutory Framework*

On December 3, 1999, the President signed into law the Foreign Narcotics Kingpin Designation Act. *See* 21 U.S.C. §§ 1901-1908 (1999).  The Kingpin Act was designed to "provide authority for the identification of, and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers, their organizations, and the foreign persons who provide support to those significant foreign narcotics traffickers and their organizations, whose activities threaten the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1902.

To accomplish this, the Kingpin Act mandates the President to submit an annual report to specific Congressional committees, "identifying publicly the foreign persons that the President determines are appropriate for sanctions...[and] detailing publicly the President's intent to impose sanctions upon these significant foreign narcotics traffickers..." 21 U.S.C. § 1903(b)(1)-(2).[16]  Pursuant to the Kingpin Act, the President is authorized to impose blocking sanctions on "any significant foreign narcotics trafficker publicly identified" in the President's annual report.

---

[16] The President is authorized to supplement his mandatory report with additional designations "if at any time after the report required...the President finds that a foreign person is a significant foreign narcotics trafficker and such foreign person has not been publicly identified in [the] report..." 21 U.S.C. § 1903(h)(1)(A).

21 U.S.C. § 1904(b)(1) ("...there are blocked as of such date, and any date thereafter, all such property and interests in property within the United States, or within the possession or control of any United States person...").[17]

Moreover, the Kingpin Act provides additional authorities to the Secretary of the Treasury, acting in consultation with the heads of several other federal agencies, to designate "any foreign person...materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a significant foreign narcotics trafficker"; "any foreign person...owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker"; and "any foreign person...playing a significant role in international narcotics trafficking." 21 U.S.C. § 1902(2)-(4).[18]  Foreign persons who are so designated pursuant to the Secretary of the Treasury's statutory authorities are likewise subject to blocking sanctions under the Kingpin Act. 21 U.S.C. § 1904(b).

Pursuant to regulations promulgated by OFAC (under a delegation of authority from the Secretary of the Treasury), a foreign person designated as a significant foreign narcotics trafficker and thus placed on the Specially Designated Nationals and Blocked Persons List ("SDN List") maintained by OFAC "may seek administrative reconsideration of his, her, or its designation...or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded..." 31 C.F.R. § 501.807; *see also* 31 C.F.R. § 598.101 ("This part [Part 598] is separate from, and independent of, the other parts of this chapter...with the exception of part 501 of this chapter, the provisions of which apply to this part.").  In doing so, the foreign person "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation" and "may [also] propose remedial steps on the person's part...which the person believes would negate the basis for designation." 31 C.F.R. § 501.807(a).  The regulations further prescribe that OFAC will review the information submitted and "may request clarifying, corroborating, or other additional information." 31 C.F.R. § 501.807(b).  Following a "review of the request for reconsideration, [OFAC] will provide a written decision to the blocked person..." 31 C.F.R. § 501.807(d).

---

[17] Blocking sanctions are subject to exceptions "provided in regulations, orders, instructions, licenses, or directives issued pursuant to this chapter..." 21 U.S.C. § 1904(b).  Such exceptions fall under the discretion of the Secretary of the Treasury, who "is authorized to take such actions as may be necessary to carry out this chapter, including...promulgating rules and regulations permitted under this chapter." 21 U.S.C. § 1904(e)(1)(B).

[18] A significant foreign narcotics trafficker is defined as "any foreign person that plays a significant role in international narcotics trafficking, that the President has determined to be appropriate for sanctions pursuant to this chapter..." 21 U.S.C. § 1907(7).  Narcotics trafficking is itself defined broadly to include "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so." 21 U.S.C. § 1907(3).

B.    *Case Law*

Pursuant to the Administrative Procedure Act ("APA"), OFAC's decision on a designated party's request for reconsideration is – as with other federal agencies' action – reviewable by a United States District Court under the "arbitrary and capricious standard." *See* 5 U.S.C. § 706(a)(2) ("The reviewing court shall...hold unlawful and set aside agency action, findings, and conclusions found to be...arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). In reviewing such a decision, the court must look to "the administrative record assembled by the agency to determine whether its decision was supported by a rational basis." *Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). Accordingly, "the court must be satisfied that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Kadi v. Geithner*, 2012 WL 898778, 4 (D.D.C. 2012).

Courts have likewise found that an agency's reliance on national security does not diminish the requirement that the agency action must be rationally based. *See Santillan v. Gonzalez*, 388 F.Supp.2d 1065, 1080 (N.D. Cal. 2005). In fact, while courts have interpreted the standard of review to be "highly deferential when matters of foreign policy and national security are concerned," such deference does not preclude a court's "inquiry into the facts [of the administrative record]...to be searching and careful. *Kadi v. Geithner*, 2012 WL 898778, 6 (D.D.C. 2012) citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Moreover, courts have held that "the Constitution [requires] that the government...follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests." *Al Haramain Islamic Found. v. U.S. Dept. of Treasury*, 686 F.3d 965, 980 (9th Cir. 2011). For instance, an agency should not render a decision without providing notice of the decision-making standards and providing an opportunity to meet such standards. *Nat'l Org. for Women v. Social Security Admin.*, 736 F.2d 727, 740-741 (D.C. Cir. 1984), relying upon *Am. Cyanamid Co. v. Food & Drug Admin.*, 606 F.2d 1307, 1313-1314 (D.C. Cir. 1979).

Further, it is a fundamental tenet of administrative law that interested parties must have an effective chance to respond to the facts upon which the agency's decision rests. *Id.* at 739. Indeed, refusal to allow inspection of evidence critical to the administrative decision has been found to be constitutionally impermissible. *Ralpho v. Bell*, 569 F.2d 607, 628-629 (D.C. Cir. 1977). Due process prohibits "an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation." *Al Haramain Islamic Found. v. U.S. Dept. of Treasury*, 686 F.3d 965, 966 (9th Cir. 2011), citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 (1974). Rather, designated parties must be afforded at the very least the unclassified administrative record and must be permitted to respond in writing to rebut such evidence or negate the proposition that a designation is warranted. *Holy Land Found. for Relief*

& Dev. v. Ashcroft, 333 F.3d 156, 162 (D.C. Cir. 2003); see also Nat'l Org. for Women and Social Security Admin., 736 F.2d 727, 740-741 (D.C. Cir. 1984) (acknowledging that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact finding, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue...at a meaningful time and in a meaningful manner."); Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner, 647 F.Supp.2d 857, 905 (N.D. Ohio 2009).

Finally, courts have also found procedural due process violations where OFAC has been dilatory in its response time. See Kindhearts, 647 F.Supp.2d at 903-904 (holding that OFAC's delay of fifteen months in providing the plaintiff with an evidentiary memorandum and evidence supporting its designation of an organization as a Specially Designated Global Terrorist violated the plaintiff's due process rights); Al Haramain, 686 F.3d at 985-986 (finding that a seven-month waiting period for a statement of reasons why the plaintiff had been designated, coupled with OFAC's only releasing one document over the course of four years that could be viewed as supplying reason for OFAC's investigation and designation decision, failed to provide meaningful notice). For example, in Kindhearts, the court explained that "promptness is an important aspect of the due process right to be heard." Id. at 906 (citing Barry v. Barchi, 443 U.S. 55, 64 (1979)). In Zevallos v. Obama, the court took note of the fact that "other courts have held that extremely prolonged delays while considering [requests for reconsideration] can violate the Due Process Clause," especially where petitioners "never fully underst[and] why they have been designated..." Zevallos, No. 14-5059, 16 (2015).

In sum, the agency's conduct must comport with general principles of due process, particularly where governmental action seriously injures an individual and the reasoning of the action rests upon findings of fact, and there must also be notice and opportunity of an affected party to be able to present relevant evidence at a relevant time to responsible agency officials. Nat'l Org. for Women, 736 F.2d at 739. Indeed, a continued designation is indefinite in nature, fraught with reputational and personal consequences, and thus more than just a "mere inconvenience." See Al Haramain, 686 F.3d at 979-980.

C.    Legal Analysis

i.    Basis & Criteria for Designation

Pursuant to the Kingpin Act, a significant foreign narcotics trafficker is defined as "any foreign person that plays a significant role in international narcotics trafficking, that the President has determined to be appropriate for sanctions pursuant to [21 U.S.C. Ch. 24]." 21 U.S.C. § 1907(7). OFAC designated Respondent as a Specially Designated Narcotics Trafficker under the Kingpin Act "for [his] involvement in the drug trafficking or money laundering activities of the

Joumaa organization."[19]   OFAC has also alleged that Respondent and his brothers operated Junior International S.A. with Jorge Fadlallah Cheaitelly (later to be designated under the Kingpin Act) following Ayman Joumaa's designation as a Specially Designated Narcotics Trafficker pursuant to the Kingpin Act.[20]   Junior International S.A. is alleged to be part of the Joumaa drug trafficking and money-laundering network.[21]

Respondent respectfully rejects OFAC's allegations against him and contends that he is neither knowingly connected to narcotics trafficking nor money-laundering activities in connection with narcotics trafficking.   Moreover, Respondent reiterates that should there in fact be a basis to the allegations that OFAC has put forward against him, he is prepared to take immediate remedial action to remove that basis (or those bases).

In order to support his claim that he is not involved in narcotics trafficking or money-laundering activities in connection with narcotics trafficking, Respondent submits the following arguments to OFAC.   First, Respondent respectfully contends that there is a general lack of substantive evidence linking him to the narcotics trafficking and money-laundering scheme that OFAC alleges.   Based on the information that OFAC has made publicly available, its claims against Respondent appear to be the barest of allegations, and are conclusory in nature. Moreover, there is a notable absence of Respondent's name in other documents released by U.S. authorities regarding the same narcotics trafficking and money-laundering scheme, thereby suggesting that Respondent was designated not for any activities in which he himself engaged but rather for his familial ties to the alleged leader of this scheme—his brother, Ayman Joumaa.[22]   Absent an evidentiary basis linking Respondent to narcotics trafficking, there is no basis to maintain his designation under the Kingpin Act.

---

[19] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dept. of the Treasury's Office of Foreign Assets Control, Jan. 26, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

[20] PRESS RELEASE, Treasury Targets Key Panama-Based Money Laundering Operation Linked to Mexican and Colombian Drug Cartels, U.S. Dept. of the Treasury's Office of Foreign Assets Control, Dec. 29, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1390.aspx.

[21] *Id.*

[22] In relation to the alleged Ayman Joumaa narcotics trafficking and money-laundering network, U.S. authorities have taken a number of aggressive steps, including the Kingpin Act designation of Ayman Joumaa and those alleged to be involved in his network, the filing of criminal charges against Ayman Joumaa, additional Kingpin Act designations related to individuals and groups alleged to be tied to the Joumaa network, the filing of a civil money laundering and forfeiture complaint targeting Lebanese banks and exchange houses complicit in his network, and a Treasury 311 Patriot Act Designation against each of these same Lebanese financial institutions, amongst others. This full-court press on disrupting the activities of the Ayman Joumaa network has led to additional facts regarding the network and the individuals involved therein being publicly available.   In the view of undersigned counsel, it is significant that – outside of the designation notice – Respondent's name does not appear in any of the documents relating to these other enforcement actions.

Second, Respondent respectfully argues that whatever ties he may have to designated entities were severed nearly a decade before the narcotics trafficking and money-laundering scheme is alleged to have begun. As such, his ties to the relevant businesses at the time were entirely legitimate and were not connected in any manner to either narcotics trafficking or money laundering in support of narcotics trafficking.

Third, and finally, Respondent believes that his designation stems solely from his familial ties to Ayman Joumaa, the alleged leader of the narcotics trafficking and money-laundering network. If true, this would be contrary to the plain language of the Kingpin Act and thus statutorily impermissible. Moreover, this would also render impossible any fundamental change in Respondent's behavior to warrant rescission of his designation, as Respondent cannot change the fact that he is the brother of Ayman Saied Joumaa, who is alleged to head a narcotics trafficking network.

For these reasons, Respondent argues that OFAC should promptly render a favorable decision on his pending request for administrative reconsideration and rescind his designation under the Kingpin Act. It is Respondent's contention that such action would be in line with OFAC's policy objectives, for reasons detailed further below.

> ii.     Absence of Credible Evidence Linking Respondent to Narcotics Trafficking and/or Money Laundering Activities

OFAC has provided a paucity of evidence linking Respondent to either narcotics trafficking activities or money laundering activities in support of narcotics trafficking. The lack of any publicly available evidence linking Respondent to such activities suggests that OFAC lacks sufficient credible evidence to support its designation of Mr. Joumaa. Without an evidentiary basis for its designation of Respondent, the rescission of Respondent's designation is warranted.

In OFAC's press release announcing Respondent's designation, the sole allegation leveled against Respondent was that he was "involv[ed] in the drug trafficking or money

---

Moreover, the U.S. press has conducted investigative reports that have led to additional information from U.S. officials regarding the Joumaa network and its ties to Lebanese financial institutions, Latin American drug cartels, and West African criminal networks. *See e.g.*, Jo Becker, *Beirut Bank Seen as a Hub of Hezbollah's Financing*, NEW YORK TIMES (Dec. 13, 2011), *available at* http://www.nytimes.com/2011/12/14/world/middleeast/beirut-bank-seen-as-a-hub-of-hezbollahs-financing.html?_r=0.

laundering activities of the Joumaa organization."[23]  No substantive evidence in support of this conclusory allegation was provided.  The sole remaining claim leveled publicly against Respondent – which was not directed at him in his personal capacity but rather in his capacity as one of the "Joumaa brothers" – was that he was operating Junior International S.A., an entity "affiliated with the significant Lebanese drug trafficker and money launderer, Ayman Joumaa," along with the Kingpin Act-designated Jorge Fadlallah Cheaitelly.[24]  These are the only occasions in which Respondent is mentioned in documents released by U.S. authorities.

This latter element is significant, insofar as the Joumaa narcotics trafficking network is one of the most well-documented trafficking schemes in the last half-decade.[25]  U.S. authorities have taken a number of steps to enforce its laws and prosecute individuals associated with this cross-continental narcotics trafficking and money-laundering scheme, and have done so publicly.  Those involved in the scheme have been publicly exposed in a way rarely seen by the U.S. government and their activities have been carefully detailed.  Yet, Respondent's name is missing from these documents and from such exposure.  Despite the unraveling of a number of illicit schemes related to the Joumaa narcotics trafficking network, none have involved Respondent nor has Respondent been mentioned in any manner.  With such wide availability of the facts underlying this narcotic trafficking scheme, Respondent's name is notably and tellingly absent.

      iii.    Respondent's Ties to Designated Entities Were Either Non-Existent or Were Severed Long Before the Alleged Narcotics Trafficking & Money-Laundering Scheme Began

Among the designated entities alleged to be involved in the Joumaa narcotics trafficking network, Respondent was involved in three of them: Almacen Junior; Almacen Junior No. 2; and Junior International S.A.[26]  However, Respondent's relationship with each of these entities

[23] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dept. of Treasury's Office of Foreign Assets Control, Jan. 26, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

[24] PRESS RELEASE, Treasury Targets Key Panama-Based Money Laundering Operation Linked to Mexican and Colombian Drug Cartels, U.S. Dept. of the Treasury (Dec. 29, 2011), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1390.aspx.

[25] Besides the plethora of documentation from U.S. authorities, news agencies have done their own investigative reports into the Joumaa narcotics trafficking and money-laundering network, often with the aid of background conversations with U.S. officials. *See e.g.*, Jo Becker, Beirut Bank Seen as a Hub of Hezbollah's Financing, *N.Y. Times* (Dec. 13, 2011), *available at* http://www.nytimes.com/2011/12/14/world/middleeast/beirut-bank-seen-as-a-hub-of-hezbollahs-financing.html.

[26] It should be mentioned that of these three entities, only one is specifically alleged to be involved in the narcotics trafficking scheme: Junior International S.A.  Moreover, it is only with Junior International S.A. that Respondent is explicitly tied in OFAC's press releases. *See e.g.*, PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, U.S. Dept. of Treasury's Office of Foreign Assets Control, Jan. 26, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx; PRESS RELEASE,

predated the period in which they are alleged to have been involved in the Joumaa narcotics trafficking scheme. As discussed above, Respondent withdrew from each of his Colombia-based businesses in 2000 upon returning to Lebanon to start up agricultural work. As such, his involvement in the activities of these three designated entities was effectively terminated more than a decade and a half ago. Thus, Respondent cannot be said to have played a role in the Joumaa narcotics trafficking scheme by virtue of his involvement in these three entities since he severed his relationship to the designated entities prior to their alleged participation in narcotics trafficking.

Furthermore, Respondent notes that he executed a "Waiver, Acquittal, and Deposal of a General Power of Attorney," which had been previously given to his brother – Akram Saied Joumaa.[27] In this document, Respondent terminated the power of attorney that had been given to Akram Joumaa and "discharge[d] and release[d] each other (i.e., Respondent, Akram Joumaa, and Ayman Saied Joumaa) from any claim concerning said partnership and from any previous commercial or civil dealing."[28] This document was executed before a representative from the Ministry of Justice, Republic of Lebanon, and notarized as such.[29] This waiver was part of the comprehensive settlement that the Joumaa brothers entered into following the termination of their commercial partnership in 2000-2001. As such, it evidences the fact that Respondent had ended all business-related dealings with his brothers at this same time, which predates the activities for which OFAC alleges he was involved.

iv.  Designation of Respondent Solely on the Basis of His Familial Ties to Ayman Joumaa is Antithetical to Kingpin Act

Pursuant to the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1901 *et. seq.,* the President and/or the Secretary of the Treasury are authorized to designate for sanctions:

1. Any significant foreign narcotics trafficker;
2. Any foreign person materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the narcotics trafficking activities of a significant foreign narcotics trafficker;
3. Any foreign person owned, controlled, or directed by, or acting for or on behalf of, a significant foreign narcotics trafficker; or

---

Treasury Targets Key Panama-Based Money Laundering Operation Linked to Mexican and Colombian Drug Cartels, U.S. Dept. of Treasury's Office of Foreign Assets Control, Dec. 29, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1390.aspx.

[27] Exhibit G-Waiver, Acquittal, & Deposal of a General Power of Attorney Document.

[28] Exhibit G-Waiver, Acquittal, & Deposal of a General Power of Attorney Document.

[29] Exhibit G-Waiver, Acquittal, & Deposal of a General Power of Attorney Document.

    4. Any foreign person playing a significant role in international narcotics trafficking.[30]

In contrast to certain other legislative or executive authorities, the Kingpin Act does not provide the authority for the President or the Secretary of the Treasury to designate for sanctions an individual based solely on their familial relations with a significant foreign narcotics trafficker.[31] Nonetheless, in the absence of any substantive allegations that Respondent played a role in the narcotics trafficking activities of his brother or acted for or on behalf of his brother in any capacity, OFAC looks to have designated Respondent under the Kingpin Act for just such familial relationship. This is antithetical to the plain language of the Kingpin Act and thus exceeds the bounds of the legislative authorization provided to the President and/or the Secretary of the Treasury.

    Moreover, undersigned counsel notes that should the factual basis of Respondent's designation be limited to his familial relationship with Ayman Saied Joumaa, there would be no way for Respondent to undertake remedial action to demonstrate a fundamental change of circumstance warranting rescission of his designation. No matter what action Respondent takes, he will remain the brother of Ayman Saied Joumaa, and there is no changing that basic fact of the relationship. As such, designating Respondent purely on the basis of his familial ties leaves him with no recourse to engage in conduct warranting rescission of his designation.

    In consideration of the fact that Respondent's ties to the designated entities were severed more than a decade ago and thus preceded the alleged conduct, the sole remaining basis for Respondent's designation is his familial ties to the Joumaa brothers – and, in particular, Ayman Saied Joumaa. As noted above, maintaining a designation on this basis is anathema both to the plain language of the Kingpin Act and to the policy objectives underlying U.S. sanctions. As such, Respondent contends that his designation under the Kingpin Act should be rescinded so as to avoid further harm to his person.

---

[30] 21 U.S.C. § 1904(b).

[31] *Cf.,* Executive Order 13405, "Blocking Property of Certain Persons Undermining Democratic Processes of Institutions in Belarus" (June 16, 2006), *available at* http://www.treasury.gov/resource-center/sanctions/Documents/13405.pdf; Executive Order 13448, "Blocking Property and Prohibiting Certain Transactions Related to Burma" (Oct. 18, 2007), *available at* http://www.gpo.gov/fdsys/pkg/FR-2007-10-23/pdf/07-5270.pdf; Executive Order 13315, "Blocking Property of the Former Iraqi Regime, Its Senior Officials and Their Family Members, and Taking Certain Other Actions" (Aug. 28, 2003), *available at* http://www.treasury.gov/resource-center/sanctions/Documents/13315.pdf; Executive Order 13441, "Blocking Property of Persons Undermining Sovereignty of Lebanon and Its Democratic Processes and Institutions" (August 1, 2007), *available at* http://www.gpo.gov/fdsys/pkg/FR-2007-08-03/pdf/07-3835.pdf.

*v.*       *Conclusion*

For the aforementioned reasons, Respondent contends that his designation is in error and lacks an appropriate evidentiary basis upon which to continue the designation. OFAC has failed to provide substantive evidence linking Respondent to the alleged narcotics trafficking scheme nor has Respondent's name turned up in the volumes of documentation that U.S. authorities have made publicly available. None of this is surprising to Respondent, as he cut ties to the persons and entities designated alongside him more than a decade prior to his designation under the Kingpin Act. In Respondent's view, his designation is being maintained on the basis of the fact that he is the brother of Ayman Saied Joumaa. Maintaining his designation on this basis, though, would be statutorily impermissible without a clear connection between Respondent and narcotics trafficking activities. As such, Respondent respectfully requests that OFAC carefully review the factual basis of his designation and ultimately rescind his designation under the Kingpin Act.

### III.    Policy Considerations

Respondent implores OFAC to undertake a speedy and thorough review of Respondent's request for reconsideration in light of the substantial personal and reputational costs of his continued designation as a specially designated narcotics trafficker, as well as the significant U.S. foreign policy and national security interests that threaten to be undercut by his continued designation.

### A.       *Failure to Provide Factual Basis for Respondent's Designation Impedes U.S.'s Ability to Achieve Policy Aims*

Pursuant to 31 C.F.R. § 501.807, designated parties can seek administrative reconsideration of their designation or assert that the circumstances resulting in the designation no longer apply and thus request to have their designation rescinded. However, a major barrier to designated parties being able to do so is the refusal of OFAC to provide the evidentiary basis for a party's designation in a timely manner. This impedes not just a designated party's interest in being removed from OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List"), but also the ultimate achievement of U.S. foreign-policy goals. Insofar as designated parties lack knowledge of what behavior may have served as the basis for their designation, they are unable to remediate that problematic behavior or provide an adequate defense as to why OFAC's allegations are in error. As such, U.S. authorities are inhibited from achieving their ultimate policy goals in ensuring that a designee credibly ends their problematic activities.

U.S. authorities have acknowledged that "the primary goal for sanctions is behavioral change."[32] The use of U.S. economic sanctions is designed to isolate bad actors from the U.S. financial system and convince them that only a credible change in behavior will lead to sanctions lifting.   As OFAC has stated, "[s]anctions are a means to an end; [their] ultimate goal...is behavioral change."[33]  Repeatedly, OFAC has stressed that it has removed hundreds of persons and/or entities from the SDN List "upon a showing of behavioral change."[34]  In doing so, OFAC has noted that it "seeks to reward those who change behavior and motivate others to do so."[35]

Nonetheless, OFAC's stated policy is at odds with its actual behavior.  As reports have noted, "those under U.S. sanctions have often waited for months or years, and sometimes until after death, to be removed from the blacklists."[36]  This has proven "a long, difficult process," often without being able "to see the evidence being used against them, or even to a prompt response."[37]  This refusal to provide the factual basis for a party's designation in a timely manner has been a problem endemic to OFAC's work.  Without presentation of the unclassified record detailing the reasons for a party's designation, the ability of a designee to change their behavior becomes difficult, if not impossible.  In the process, U.S. foreign-policy goals are thwarted, not achieved.

Petitioner believes that the unclassified record detailing the factual basis for his designation would allow him to do one of two things: either (1) dispute the factual basis for his designation and provide information and documentation relevant to OFAC's consideration of whether an erroneous designation was made, or (2) remediate any behavior that may have served as the basis for the designation.  Petitioner asserts that he is interested in good-faith cooperation with OFAC to resolve concerns over whatever conduct may have given rise to the designation, but reiterates that he must know the specific facts being relied upon before he would be able to do so.  Petitioner notes that OFAC's provision of the unclassified record would serve not just his own interest in seeing his designation rescinded, but also the foreign-policy interests of the

---

[32] *See* PRESS RELEASE, Treasury Lifts Sanctions on the Defunct Colombian Business Empire Led by the Rodriguez Orejuela Family, U.S. Dept. of the Treasury (June 19, 2014), *available at* http://www.treasury.gov/press-center/press-releases/Pages/jl2436.aspx.

[33] Adam Szubin, *Sanctions 101: Part II – Enforcement and Its Effects*, U.S. Dept. of the Treasury (June 2, 2014), *available at* http://www.treasury.gov/connect/blog/Pages/Sanctions-101-Pt-2-.aspx.

[34] *Id.*

[35] Treasury Department Explains Value, Effect of Sanctions, IIP Digital – U.S. Department of State (June 12, 2014), *available* at http://iipdigital.usembassy.gov/st/english/article/2014/06/20140611301159.html?CP.rss=true#axzz3g4tLBWkQ.

[36] Rachel Louise Ensign & Samuel Rubenfeld, U.S. Blacklist Removal Requests Get No Response, Complaint Alleges, *Wall Street Journal* (Jan. 9, 2014), *available at* http://blogs.wsj.com/riskandcompliance/2014/01/09/u-s-blacklist-removal-requests-get-no-response-complaint-alleges/.

[37] Jamila Trindle, Did an Acquitted War Crimes Suspect Just Show How to Get Off the Treasury Department's Blacklist?, *Foreign Policy* (Feb. 6, 2014), *available at* http://foreignpolicy.com/2014/02/06/did-an-acquitted-war-crimes-suspect-just-show-how-to-get-off-the-treasury-departments-blacklist/.

United States.  As such, Petitioner urges OFAC to provide the unclassified record in a timely manner so that there is no further delay to this process.

### B.    Danger of a Mistaken Designation

In order for U.S. sanctions to command the respect of both U.S. and foreign parties, it is important that all parties have a degree of confidence in the accuracy of OFAC's designations and the legitimacy of the fact-finding process underlying those designations.  The perception that OFAC's designations are prone to error and its fact-finding anything less than exhaustive and conclusive could undermine the basis for compliance with U.S. sanctions and thus threaten the efficacy of economic sanctions as a tool of U.S. national security policymaking.  As such, a mistaken designation harms not just the designee—whose economic livelihood is under attack— but also U.S. sanctions and their contributions to U.S. foreign policymaking.

Moreover, being an agency of limited and finite resources, any OFAC designation that is made in error distracts and diverts attention and resources away from what could have proved more beneficial uses.  This is a cost that is compounded the longer the errant designation is kept in place, especially when the designee requests administrative reconsideration of its designation and thus imposes on OFAC the administrative burden of undertaking a thorough and exhaustive review of the factual basis underpinning the designation.  OFAC is thus incentivized to perform an intensive fact-finding process prior to designation to ensure confidence that the designee had indeed engaged in activities anathema to U.S. foreign policy interests and to expeditiously review the basis for a designation once a request for administrative reconsideration is filed so as to best mitigate the costs of a mistaken designation should one prove apparent.

For these reasons, Respondent contends that an expedient and conclusive determination on his request for reconsideration is critical to instilling confidence in the accuracy of OFAC's fact-finding process and to ensuring that OFAC's limited resources are expended in the most efficacious manner.  Respondent rejects the allegations that he is involved in activities in support of narcotics trafficking and implores OFAC to review the factual basis for his designation, particularly in light of Respondent's responses to OFAC's queries and the documents that accompany those responses.   Respondent contends that the evidentiary basis in support of Respondent's designation is far less than conclusive and urges OFAC to engage with Respondent in a manner productive to both parties.  Doing so will not only help to repair the damage done to Respondent as a result of his mistaken designation, but will also inure to the ultimate benefit of OFAC and the U.S. government—which will have demonstrated seriousness of purpose in ensuring that its sanctions designations are fairly and correctly determined.

## IV.   Conclusion

Respondent respectfully requests that OFAC reconsider whether the factual basis relied upon to maintain Respondent's designation is sufficient in light of the Respondent's response to OFAC's questionnaire and the additional arguments offered in support of rescission. Respondent respectfully submits that the factual basis supporting his designation is erroneous and that he is not (nor has he been) involved in any manner in any activities related to narcotics trafficking or money-laundering activities in connection with narcotics trafficking.   As such, Respondent requests that his designation be rescinded and his name be removed from OFAC's SDN List.

Please forward all correspondence concerning this matter to undersigned counsel's Washington, D.C. office:

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

We thank you for your consideration and look forward to your response.

Sincerely,

Erich C. Ferrari

 Ferrari & Associates, P.C.

1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Tel. 202-280-6370
Fax. 877-448-4885

October 13, 2015

**SENT VIA EMAIL AND FEDERAL EXPRESS: # 8088 6715 2196**

Mark Samara
Assistant Director
Crime/Narcotics & Western Hemisphere Division
Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
Treasury Annex
1500 Pennsylvania Ave., NW
Washington, D.C. 20220

Re:   **Anwar Saied Joumaa's Supplemental Response to OFAC's May 5, 2015
      Questionnaire**
      *Anwar Saied Joumaa—FNK—5088*

Dear Mr. Samara,

On January 26, 2011, acting pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Anwar Saied Joumaa ("Petitioner") for his alleged "involvement in the drug trafficking or money laundering activities of the Joumaa organization."[1]  On March 17, 2015, Petitioner, acting by and through undersigned counsel, filed a formal request for administrative reconsideration of his designation.  That reconsideration matter has been assigned Case ID FNK-5088.

On May 5, 2015, OFAC sent undersigned counsel a questionnaire seeking information and documents responsive to a series of questions relevant to OFAC's consideration of Petitioner's request for reconsideration.  On August 3, 2015, Petitioner, acting by and through undersigned counsel, filed a response to OFAC's May 5, 2015 Questionnaire.  This response included analysis and considerations addressing why Petitioner's designation should be rescinded.

---

[1] PRESS RELEASE, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering, U.S. Dept. of the Treasury, Jan. 1, 2011, *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1035.aspx.

Through the instant submission, Petitioner seeks to supplement his response to OFAC's May 5, 2015 Questionnaire.  Below, Petitioner provides additional details as to his activities over the past several years, particularly regarding his principal employment as a farmer in Lebanon.  As such, this supplemental response includes extensive information and documentation involving his current employment and activities in Lebanon.

Because this response contains business information and other information of a sensitive nature, undersigned counsel requests that OFAC treat this correspondence confidentially.  If OFAC believes that it is required to release this document or any of the information contained within it to the public pursuant to the Freedom of Information Act ("FOIA") or any other law, please notify undersigned counsel as soon as possible.  Undersigned counsel will act promptly to provide additional information in support of this request for confidentiality.

## I.    Additional Information for Petitioner's August 3, 2015 Questionnaire

In Petitioner's response to OFAC's May 5, 2015 Questionnaire, Petitioner detailed his role in companies in which he and his brothers held an interest, as well as his relationships with his brothers and certain other identified individuals.  Moreover, Petitioner provided additional information and analysis that evidenced reasons why Petitioner's designation was made in error and deserves rescission.

Petitioner also provided some details as to the scope of his current activities in Lebanon in his initial response to OFAC's May 5, 2015 Questionnaire.  In that submission, Petitioner noted that he is currently employed as a farmer on lands that he owns in Lebanon, through which he sells fruits and vegetables to wholesalers at a profit.  Petitioner began working agriculture soon after he and his brothers entered into a Settlement Agreement in 2001-2, which saw them wind down their business operations in Columbia and Venezuela and share the profits from those businesses between themselves.

In order to substantiate his prior representations, Petitioner seeks to provide additional materials evidencing his present employment as a farmer in Lebanon.  Petitioner believes that this additional information and documentation should assuage any concerns OFAC may have regarding Petitioner's current activities.   To that end, Petitioner is attaching extensive documentation to this supplemental response for OFAC's review and respectfully requests OFAC to substantively engage with the material and pose further inquiries to Petitioner as may be necessary.

A.    *Settlement Agreement between Joumaa Brothers*

In 2002, the Joumaa brothers -- collectively, Akram Saied Joumaa, Anwar Saied Joumaa, Ayman Saied Joumaa, and Mohammad Joumaa – ended their business collaboration in Colombia and Venezuela and entered into a settlement agreement to divide the profits accumulated from such activities.[2]  As part of this settlement agreement, the Joumaa brothers agreed to discharge each other from any future claims relating to past business activities addressed in the settlement agreement.[3]  Moreover, because all of the assets of the businesses in which the Joumaa brothers were active, as well as all real estate in Lebanon and Colombia shared between them, were registered in Akram Saied Joumaa's name, the settlement agreement sought to equitably divide these assets between the brothers.

As a result of this settlement agreement, Petitioner received certain properties in Lebanon and Colombia in whcih the Joumaa brothers had previously shared ownership and a lump-sum payment to compensate for the division of profits between the brothers.[4]  Moreover, Petitioner used part of this lump-sum payment ($150,000.00) to purchase two tracts of land – Tal Zenoub Real Estate No. 96 & 98 – from his brother, Akram Joumaa.[5]  The Lebanese properties have been and are currently being used by Petitioner to farm fruits and vegetables, as further discussed below.

B.    *Petitioner's Agricultural Work in Lebanon*

As noted above, Petitioner took full ownership and control of real estate in Tal Zenoub from his brother, Akram Saied Joumaa, as part of the 2002 settlement agreement between the Joumaa brothers.[6]  Since this time, Petitioner has principally been engaged in using his real estate for the purpose of cultivating fruits and other crops.  As evidenced by documents attached to this submission, Petitioner has purchased land; hired laborers; bought fruit and vegetable seeds, as well as necessary farming equipment; and entered into contracts for the sale of such produce to Lebanese wholesalers since returning to Lebanon.[7]  Taken together, this documentation provides clear evidence that Petitioner's principal employment and principal source of income lie with farming his land in Lebanon and counters allegations that Petitioner derives any income—much less significant income—from activities related to narcotics trafficking.

---

[2] These activities were described in detail in Petitioner's prior submission.
[3] Exhibit A – Settlement Agreement Documents.
[4] Exhibit A – Settlement Agreement Documents.
[5] Exhibit B – Check to Akram Saied Joumaa.
[6] Exhibit A – Settlement Agreement Documents.
[7] Exhibit C – Agriculture-Related Documents.

Following the 2002 settlement agreement between the Joumaa brothers, Petitioner began farming Tal Zenoub Real Estate No. 96 & 98. In order to start farming this land, Petitioner purchased farming equipment and fruit and vegetable seeds, as evidenced in the attached documentation.[8] Moreover, Petitioner had to hire laborers to work the land – the documentation for which is likewise attached to this submission.[9]

Since 2006, Petitioner has derived significant income from this work, selling the produce of his agricultural farming to Jaber Trading Co. in Lebanon at a profit.[10] Petitioner has also sold additional goods from farming his lands to three individuals: Mr. Ali Omeyrat, Mr. Issam Syala, and Ahmed Elsamad. Such sales have proven to be Petitioner's principal source of income over the last decade in Lebanon.

### C.    Petitioner's Banking Statements

Attached to this submission, Petitioner is providing his banking statements with the Lebanese Canadian Bank ("LCB") between the years 2002-2012.[11] As OFAC is aware, the Lebanese Canadian Bank was implicated in the U.S. Treasury Department and Drug Enforcement Administration's investigation into the money-laundering activities of certain Latin American, West African, and Lebanese drug traffickers. U.S. authorities alleged that the Lebanese Canadian Bank worked with certain customers to launder the proceeds from the sale of narcotics – some of the funds of which were funneled to members of Hezbollah, a U.S.-designated terrorist organization.

It is undersigned counsel's belief that U.S. authorities have long had access to the Lebanese Canadian Bank's records, including those of its banking clients such as Anwar Saied Joumaa.[12] Whether or not OFAC has reviewed Petitioner's transactions with the bank is unclear, but Petitioner is herein providing OFAC with access to Petitioner's LCB bank statements in order to prove that Petitioner's financial activities were lawful and not in support of narcotics trafficking or money-laundering activities. Together with documents regarding the scope of Petitioner's current employment as a farmer in Lebanon, OFAC's review of these banking statements will now be provided its proper context.

---

[8] Exhibit C – Agriculture-Related Documents.

[9] Exhibit C – Agriculture-Related Documents.

[10] Exhibit C – Agriculture-Related Documents.

[11] Exhibit D – LCB Banking Statements.

[12] See Jo Becker, Beirut Bank Seen as a Hub of Hezbollah's Financing, NEW YORK TIMES (Dec. 13, 2011), available at http://www.nytimes.com/2011/12/14/world/middleeast/beirut-bank-seen-as-a-hub-of-hezbollahs-financing.html?_r=0.

## II.    Additional Considerations

Pursuant to the Kingpin Act, a significant foreign narcotics trafficker is defined as "any foreign person that plays a significant role in international narcotics trafficking, that the President has determined to be appropriate for sanctions pursuant to [21 U.S.C. Ch. 24]."  21 U.S.C. § 1907(7).  OFAC designated Petitioner as a Specially Designated Narcotics Trafficker under the Kingpin Act "for [his] involvement in the drug trafficking or money laundering activities of the Joumaa organization."  OFAC has also alleged that Petitioner and his brothers operated Junior International S.A. with Jorge Fadlallah Cheaitelly (later to be designated under the Kingpin Act) following Ayman Joumaa's designation as a Specially Designated Narcotics Trafficker pursuant to the Kingpin Act.  Junior International S.A. is alleged to be part of the Ayman Saied Joumaa drug trafficking and money-laundering network.

As stated in Petitioner's previous submission, Petitioner respectfully rejects OFAC's allegations against him and contends that he is neither knowingly connected to narcotics trafficking nor money-laundering activities in connection with narcotics trafficking.  Moreover, Petitioner reiterates that should there in fact be a basis to the allegations that OFAC has put forward against him, he is prepared to take immediate remedial action to remove that basis.

Petitioner contends that, in addition to his initial responses to OFAC's May 5, 2015 Questionnaire, the documents attached to this current response provide further evidence for his claim that his designation is either in error or solely related to his familial ties with OFAC's key target, Ayman Saied Joumaa.  As is clear from the documents attached, Petitioner has spent the last decade-plus of his life—ever since his return from Colombia—involved in farming land that he owns.  His income derives from fruit and vegetables that he sells to Lebanese wholesalers at a profit.  Outside of the assets he held as a result of the 2002 Settlement Agreement between him and his brothers, Petitioner has had no other major source of income over the last decade.

Petitioner has also attached his banking statements to this submission in order to be fully transparent with OFAC about his sources of income.  Petitioner contends that these statements show that his income derives principally from his employment as a farmer and not from any illicit sources, as OFAC alleges.  Should OFAC have any questions regarding transactions contained in these banking statements, Petitioner urges OFAC to contact him so that he can transparently and in good-faith explain their source and use.  As Petitioner has repeated time and again, he is prepared to work cooperatively with OFAC to resolve its concerns regarding the alleged narcotics-trafficking activities.

Nonetheless, Petitioner respectfully reiterates his belief that his designation stems solely from his familial ties to Ayman Saied Joumaa, the alleged leader of the narcotics trafficking and

money-laundering network known as the Joumaa Organization.   As before, Petitioner argues that, if this is the case, then there is no plausible way for Petitioner to remediate his conduct, as he cannot change the fact that his brother is Ayman Saied Joumaa.   Should this be the basis for Petitioner's designation, Petitioner repeats his contention that it would be contrary to the plain language of the Kingpin Act, and thus statutorily impermissible, absent any evidence that he was using these familial ties to engage in narcotics trafficking activities.   As such, Petitioner respectfully requests OFAC to fully disclose the factual basis for his designation so that he can better understand the reason(s) for his designation and take any action to remediate conduct that OFAC believes establishes a continued basis for Petitioner's designation.

### III.   Conclusion

Undersigned counsel respectfully requests that OFAC consider the information contained herein alongside the initial response to OFAC's May 5, 2015 Questionnaire.   If OFAC seeks additional information or clarifications from Petitioner regarding any of these responses, please do not hesitate to contact undersigned counsel.

Please forward all correspondence concerning this matter to undersigned counsel's office:

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Thank you for your consideration and Petitioner looks forward to your response.

Sincerely,

Erich C. Ferrari

6